❐ Original ❐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
information about the locations of the following six (6) cellular telephones assigned call numbers 747-724-5107, 818-478-0243, 414-210-8099, 414-213-5108, 414-334-4157, and 818-614-0909, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054

Case No. 25-931M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______
*(identify the person or describe the property to be searched and give its location)*:

see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 6/6/2025 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Judge Nancy Joseph.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ______.

Date and time issued: 5/27/2025 4:25 p.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, WI

Honorable Judge Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephones assigned call numbers (collectively referred to as the Target Cell Phones") as follows:

    a. **747-724-5107**, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    b. **818-478-0243,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    c. **414-210-8099,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    d. **414-213-5108,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    e. **414-334-4157**, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    f. **818-614-0909,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

2. Information about the location of the Target Cell Phones that are within the possession, custody, or control of T-Mobile.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the Target Cell Phones described in Attachment A for a period of thirty days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, and T-Mobile, are required to disclose the Location Information to the government. In addition, AT&T and T-Mobile, must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T and T-Mobile services, including by initiating a signal to determine the location of the Target Cell Phones on AT&T and T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T and T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, ________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile, and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in custody of T-Mobile. The attached records consist of _________________________.

I further state that:

a. All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile and they were made by T-Mobile as a regular practice; and

b. Such records were generated by T-Mobile's electronic process or system that produces an accurate result, to wit:

1. The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile in a manner to ensure that they are true duplicates of the original records; and

2. The process or system is regularly verified by T-Mobile and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

____________________________ ____________________________________________

Date Signature

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

information about the locations of the following six (6) cellular telephones assigned call numbers 747-724-5107, 818-478-0243, 414-210-8099, 414-213-5108, 414-334-4157, and 818-614-0909, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054

Case No. 25-931M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

see Attachment A,

located in the ______________ District of ______________________ , there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Distribution of, and Possession with Intent to Distribute Controlled Substances; Attempt and Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances |

The application is based on these facts:

see attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Harleen Kaur
*Applicant's signature*

Harleen Kaur, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 5/27/2025

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, WI

Honorable Judge Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Harleen Kaur, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the locations of the following seven (7) cellular telephones assigned call numbers as follows (collectively, the "Target Cell Phones"):

a. **747-724-5107**, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054;

b. **818-478-0243,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054;

c. **414-210-8099,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054;

d. **414-213-5108,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054;

**e.** **414-530-4099,** whose service provider is service provider service provider is AT&T, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408;

f. **414-334-4157**, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054; and

g. **818-614-0909,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with The Department of Homeland Security (DHS), Homeland Security Investigations (HSI). I have been employed since September 2022. I am an investigative or law enforcement officer of the United States within the meaning of Section 2501(7) of Title 18, United States Code (USC), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, USC. As part of my duties as a Special Agent, I investigate violations of the federal laws relating to Title 21 Controlled Substances. I am empowered by a Memorandum of Understanding (MOU) with the Drug Enforcement Agency to conduct Title 21 Controlled Substance investigations. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. I have participated in investigations involving Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the DEA and HSI. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 (conspiracy to distribute and possess with intent to distribute controlled substances), 841(a)(1) (distribution of controlled substances), and 843(b) (using a communication facility in furtherance of drug trafficking) have been committed, are being committed, or will be committed by **Luis QUINONEZ-HERNANDEZ** (the user of cellular phone numbers **747-724-5107** and **818-478-0243)**, **Carlos PEREZ-SANTANA** (the user of **414-210-8099**), **Reynaldo SANCHEZ-GONZALEZ** (the user of **414-213-5108**), **Jesus MEDINA-RODRIGUEZ** (the user of **414-530-4099**), **Gerardo OSORIO-JARAMILLO** (the user of **414-334-4157**), **Equiel MARTINEZ** (the user of **818-614-0909**) and others. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

5. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. The United States, including, in part, HSI and the DEA, is conducting a criminal investigation into the Target Cell Phone users and others regarding possible violations of Title 21, United States Code, Sections 846 and 841(a)(1).

7. In March 2023, members of North Central High Intensity Drug Trafficking Area (HIDTA), Immigration Customs Enforcement/Homeland Security Investigations, and the Drug Enforcement Administration received information about a large drug trafficking organization affiliated with Sinaloa, Mexico, begin operated in Milwaukee, Wisconsin. The investigation has further revealed that the money laundering/drug trafficking organization (MLDTO) is operating in Milwaukee, Wisconsin, Southern California, and Mexico, and that **QUINONEZ-HERNANDEZ**, the user of **747-724-5107** and **818-478-0243,** makes use of commercial shipping companies to send cocaine to and from Southern California and facilitates the importation of controlled substances from Mexico, into the United States, and elsewhere. In part, the investigation has involved court authorized interception orders for various member of the MLDTO. During the course of the investigation, all of the users of the Target Cell Phones have been intercepted in pertinent conversations over the monitored phones regarding the target offenses.

### December 24, 2024, Seizure of Two Kilograms of Cocaine Shipped by QUINONEZ-HERNANDEZ from West Allis, Wisconsin

8. On December 18, 2024, United States Magistrate Judge Nancy Joseph, Eastern District of Wisconsin, authorized a GPS/E911 court order (*see* Case No. 24-949M(NJ)) over **747-724-5107**. On December 18, 2024, E911/GPS data revealed that was located in the area of Van Nuys, California. On December 20, 2024, at approximately 8:10 a.m., E911/GPS data revealed **747-724-5107** was in the area of the Los Angeles International Airport (LAX). On December 20,

2024, at approximately 1:40 p.m., E911/GPS data revealed **747-724-5107** was at the Chicago O'Hare International Airport (ORD). Case agents continued monitoring E911/GPS data over **747-724-5107** that same day, which placed **747-724-5107** in Milwaukee, Wisconsin.

9. On December 19, 2024, the Honorable United States Magistrate Judge Nancy Joseph, Eastern District of Wisconsin, authorized a Pen Register and Trap and Trace (*See* App. No. 16566) over **747-724-5107.**

10. Case agents monitored both E/911 and Pen Register data over **747-724-5107** and determined between December 19, 2024, and December 23, 2024, **747-724-5107** attempted to call drug trafficking organization member Daniel MORALEZ approximately six times, which was corroborated by intercepted data over MORALEZ. Case agents believe MORALEZ did not have a completed call or text exchange (incoming or outgoing) with **747-724-5107**. However, based on Pen Register data over **747-724-5107**, **747-724-5107** had approximately 30 telephonic contacts with **414-213-5108**, a phone used by **Reynaldo SANCHEZ-GONZALEZ**.

11. Between December 19, 2024, and December 23, 2024, case agents attempted to locate **747-724-5107** based on E911/GPS data. However, the GPS radius of **747-724-5107** generally produced too large of a radius for case agents pinpoint the exact location of **747-724-5107**, at times contending with a radius of nearly 4,000 meters, or the equivalent of approximately 2.5 miles. On December 24, 2024, at approximately 6:57 a.m., GPS data placed **747-724-5107** at Milwaukee General Michell Airport. On December 24, 2024, at approximately 3:26 p.m., GPS data placed **747-724-5107** in the vicinity of the Los Angeles International Airport. Case agents conducted an analysis of GPS data and cell tower data and determined **747-724-5107** was likely at one of several hotels near a Milwaukee Veterans Affairs building. On December 26, 2024, case agents issued a subpoena to the Best Western Plus, located at 5501 W. National Avenue,

Milwaukee, Wisconsin. Case agents requested all folio information for guests who provided a California identification upon registry on December 20, 2024, and who checked out of the Best Western Plus on December 24, 2024. One registered guest matched the guest parameters: Luis Gabriel QUINONEZ. A Best Western Plus employee provided case agents with the registration information provided by **QUINONEZ-HERNANDEZ**. **QUINONEZ-HERNANDEZ**, who provided the email address L.gabriel1489@hotmail.com, telephone number **818-478-0243**, and address 6200 Hazeltine Avenue, Van Nuys, California, 91401. Law enforcement queries of the address listed **Luis Gabriel QUINONEZ** with a corresponding date of birth of January 4, 1989, associated with the above address. The Best Western Plus employee provided case agents with still images of **QUINONEZ-HERNANDEZ** from the hotel's video surveillance. The photograph associated with California Department of Motor Vehicles for **QUINONEZ-HERNANDEZ** matched the surveillance images of **QUINONEZ-HERNANDEZ** at the Best Western Plus.

12. On December 24, 2024, case agents received information from an Ontario, California, police officer, who is also a HSI Task Force Officer and canine handler, indicating the officer seized a suspicious United Parcel Service (UPS) parcel while conducting interdiction operations at a UPS next day inbound sorting facility located in Ontario, California. According to the parcel's label, the parcel was shipped by "Alfredo Garcia," bearing a listed phone number of (818) 478-0244 and address of 2931 S. 100th Street, West Allis, Wisconsin. The consignee was listed as "Ana Ortiz" at 10642 Haskell Avenue, Granada Hills, California. The parcel had assigned tracking number 1Z 180 9EF 15 7565 7540 and was shipped "UPS Early 1+," the most expensive method of UPS shipping. The cost to ship the parcel from West Allis, Wisconsin, to Granada Hills, California, was approximately $233.00.

13. Based on the officer's narcotics training and experience, the officer deployed canine "Pip." "Pip" alerted to the presence of narcotics in the parcel. The officer obtained a California State Search Warrant, signed by the Honorable Judge J. Wilkerson of the San Bernardino Superior Court of the West Valley District. After obtaining the search warrant, the officer opened the parcel and discovered two rectangular brick-shaped objects that were double bagged with a black and brown grocery bag. The officer cut into one of the bricks which revealed a white colored powder inside. A sample from one of the bricks later field-tested positive for the presence of cocaine and weighed approximately two kilograms.

14. On December 30, 2024, case agents spoke with the UPS employee who assisted with the parcel's mailing on December 23, 2024. According to the UPS employee, the shipper stated he was shipping Christmas decorations to California. The UPS employee stated that after assisting with the parcel, the shipper asked where he could get a haircut. The UPS employee offered the Sport Clips store located in the strip mall next to the UPS store. The UPS employee stated the shipper paid cash to ship the parcel and walked to the Sport Clips store. Case agents presented a photograph of **Luis QUINONEZ-HERNANDEZ**, and the UPS employee positively identified **QUINONEZ-HERNANDEZ** as the shipper of the seized cocaine.

15. On December 30, 2024, case agents went to the same Sport Clips store where **QUINONEZ-HERNANDEZ** received a haircut. A Sport Clips employee provided the customer log from December 23, 2024, at approximately the time **QUINONEZ-HERNANDEZ** was in the store, to case agents. According to Sport Clips customer records, an "Alfredo G" registered for a haircut using **747-724-5107**.

**<u>Court Authorized Wire and/or Electronic Interceptions over 747-724-5107 and 818-478-0243</u>**

16. On January 10, 2025, the Honorable United States District Court Judge, Lynn Adelman, Eastern District of Wisconsin, authorized the continued wire and electronic interceptions over (414) 736-6755 used by MORALEZ, and the initial wire and electronic interceptions over **747-724-5107** used by **QUINONEZ-HERNANDEZ**, for a period of 30 days. *See* Application No. 24-AP-11.

17. On February 7, 2025, the Honorable United States District Court Judge, Brett H. Ludwig, Eastern District of Wisconsin, authorized the continued interception of wire and electronic communications over **747-724-5107**, used by **QUINONEZ-HERNANDEZ**, the initial interception of wire and electronic communications over **414-213-5108** used by **SANCHEZ-GONZALEZ**, and the initial interception of wire communications over **818-478-0243**, used by **QUINONEZ-HERNANDEZ**, for a period of 30 days. *See* Application No. 24-AP-11.

18. On March 21, 2025, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the continued interception of wire and electronic communications over **747-724-5107**, used by **QUINONEZ-HERNANDEZ**, the continued interception of wire communications over **414-213-5108**, used by **SANCHEZ-GONZALEZ,** the continued interception of wire communications over **818-478-0243**, used by **QUINONEZ-HERNANDEZ**, and the initial interception of wire and electronic communications over **414-210-8099**, used by **PEREZ-SANTANA**, for a period of 30 days. *See* Application No. 24-AP-11.[1]

---

[1] The majority of the conversations intercepted pursuant to the above-referenced orders occurred in Spanish and were interpreted by contracted monitors certified in Spanish.

19. During the aforementioned prior interception periods over **747-724-5107** and **818-478-0243**, case agents learned **QUINONEZ-HERNANDEZ** continued to use the **TARGET CELL PHONES** in furtherance of his drug trafficking activities as discussed below.

**Wire Interceptions over 747-724-5107**

20. During prior interceptions over the **TARGET CELL PHONES**, **QUINONEZ-HERNANDEZ** has engaged in several intercepted conversations with "TREVI/TRINI," a suspected Mexico-based drug source-of-supply, regarding a future drug shipment concealed and/or co-mingled in some type of machinery originating from Mexico, and destined for California, which will then be re-packaged and shipped from California to Australia.

**QUINONEZ-HERNANDEZ Discusses a Drug Shipment with UM9187[2] ("Treni/Trevi") using 747-724-5107**

21. On January 19, 2025, at approximately, 2:06 p.m., **747-724-5107**, used by **QUINONEZ-HERNANDEZ**, called Mexican telephone number +52-3328039187, used by UM9187. During the call, **QUINONEZ-HERNANDEZ** stated, "I'm sorry, I forgot I was using the personal. Talk to me, talk to me." UM9187 stated, "No, well, I am going to change it too." **QUINONEZ-HERNANDEZ** responded, "No, yeah, because it's tough." **QUINONEZ-HERNANDEZ** continued, "Just send me the new one. No, well, I'm telling you, I said, 'Come on, get on it. Motivate, motivate us to do things. Instead... Listen, Rin, there...'" UM9187 replied, "Uh-huh." **QUINONEZ-HERNANDEZ** stated, "...are a some there. [STAMMERS] I'm going to give you this much for the expenses and other things so you can pay, and God's sake, everything will

---

[2] "UM9187" represents an unidentified male with the last four digits corresponding to the caller's phone number.

be good." UM9187 replied, "Listen, QUINON, listen to this. We all want to make something without investing." **QUINONEZ-HERNANDEZ** acknowledged, "Mm-hmm," and UM9187 continued, "[U/I]. Everyone. And from here... to tell you the truth [AUDIO BREAKS] [U/I] cool. [U/I] so, then... What I'm trying to say and what you are trying to say, it's that, I mean we have to invest a little. And if everything goes well tomorrow or the day after, we are, are all going to be good. [STAMMERS] It's the first thing we'll notice. Can you hear me?" **QUINONEZ-HERNANDEZ** replied, "No, no, yeah, yeah, I understand. And even then, it's not...." UM9187 continued, "And honestly, it's at one thousand (1,000)." **QUINONEZ-HERNANDEZ** replied, "The truth is that it's going to be done. I already moved where to it and everything. I already moved." UM9187 asked, "You [STAMMERS] already know where you are going to go?" **QUINONEZ-HERNANDEZ** asked, "Pardon me?" UM9187 repeated, "You already know everything then? Then everything it's ready?" **QUINONEZ-HERNANDEZ** answered, "[STAMMERS] I already moved. But, actually, I had a missed call earlier from him. I didn't answer but I already called him back and he didn't answer me, so I just wrote down to return my call when he can, when he is free." UM9187 stated, "That's fine, and—and honestly, dude, I know. Over here, this friend, cheap and good, [STAMMERS] and good money. The guy doesn't tell me anything. He just told me the day before yesterday, 'Hey, friend, how are we doing? It's been some time.' I told him how things were and we spoke. I told him, 'There is this and that, but that fucker is over there.' Then he tells me, 'Well, let's start moving, because [STAMMERS] it's been some time, right?'"

22. **QUINONEZ-HERNANDEZ** replied, "Okay, Trini [PH]. Okay, the only thing that's needed right now are the coordinates of arrival so that it could be received. And once it's here, then it's, it's going to be sent to Santa Rosalia, the meat, right?" UM9187 confirmed, "That's

right. [STAMMERS] The papers get changed and then it's sent to Santa Rosalia." UM9187 continued, "That's it, that's it. You... and then, if this come out good, the next one... I don't know, two (2) tons will be sold or ten (10) kilos, then it's going to be participation. And good." **QUINONEZ-HERNANDEZ** stated, "Yes, from this one, I also need to see something, to give out, even though, I, I, am telling you, I know, I know, that, that, hopefully, God's sake, everything, everything good and I know that you are going to include me there in the package. That's why I don't worry, but I at least, I need to get something to the people. That's how people are, the people, 'No, man, screw that.' And how I am here, everything, everything... I stayed at the warehouse to receive certain amount and I didn't see anything. I, I burned my spot here and you didn't give me..." I mean... go ahead." UM9187 replied, "That's fine. That's why I am telling you again, we have to invest a little. [STAMMERS] I... don't think that I am like, 'Come on, dude,' without anything. No, invest on your people, I am not investing, but I am investing on people."

23. **QUINONEZ-HERNANDEZ** responded, "No, no, well, yeah." UM9187 asked, "Alright? So, then... the guy says, 'Dude, invest a little. You don't have to get involved in anything, there is no problem, but just invest.' And I do get him, so then I said, 'Listen, dude, this is what's going on, I know who you are with, I know who your friend are, tell him to invest.' And I am... I'll tell you again, I'm not investing. This guy... he has a great appreciation for me from a while back. And the guy said, 'Listen, dude, I want to you to succeed. I need... because you helped me, I want to to help you. So, then I need... how much?' I said, 'This much.'" He said, 'No problem, I'll get it. And for you...'" **QUINONEZ-HERNANDEZ** replied, "That's fine, that's fine. We are going to move forward, Trini. We are going to work hard, you'll see." UM9187 continued, "[STAMMERS] What I am trying to get to is, we need to invest a little, man. In any case, let's do it little by little. I

don't think it's a lot. How much could he ask you for, one thousand (1,000)? Your friend? Your friend [STAMMERS] in order to receive."

24. **QUINONEZ-HERNANDEZ** asked, "Tell me something. How, how is it going to get here? What I didn't understand, what Prieto [PH] mentioned to me, that it's going to be... that everything it's going to arrive in a machine, that's what I didn't get. And that it has [STAMMERS] to arrive through parcel services, but that everything is going to arrive in a machine. I didn't understand if they are arriving [STAMMERS] in apparatus or in a machine, that's what I didn't understand. Or is it going to be in a fucking big box of a machine. Or what, or how?" UM9187 answered, "It's a machine that weights about two hundred and fifty (250) kilos, three hundred (300) kilos." **QUINONEZ-HERNANDEZ** replied, "Oh, shit," and UM9187 advised, "Just how it arrives, you just need to take of [STAMMERS] the insignias of Mexico and that's where you put... so it can ship..." **QUINONEZ-HERNANDEZ** asked, "So, there is no need to touch it, to do anything?" UM9187 advised, "But you are not going to do anything there, just take off and put down." **QUINONEZ-HERNANDEZ** confirmed, "Oh, it's set, it's set. It's set." UM9187 explained, "The machine is brand new. Brand new. I mean, [STAMMERS] nobody is going to do anything. It will just arrive..." **QUINONEZ-HERNANDEZ** acknowledged, "It's set, it's set." UM9187 responded, "It gets changed and it ships. That's it." **QUINONEZ-HERNANDEZ** advised, "Am going to tell you something, one thousand (1,000) dollars— one thousand (1,000), two thousand (2,000) dollars, it's not going to be possible." UM9187 replied, "Man, we'll invest a little, and God willing..." **QUINONEZ-HERNANDEZ** explained, "No, well, I am going to invest right now. I am going to put all that, but don't you think that because for a big box... Can you imagine I tell him, 'Hey, dude, a machine is going to arrive.' And what I work on the matching shop, and I am going to get a huge machine to weld and this... He is going to say, 'Don't fuck

around, you don't know...'" [VOICES OVERLAP] UM9187 asked, "What, what?" **QUINONEZ-HERNANDEZ** continued, "'...how to work, asshole. Why are you going to be asking for it, and to my address?' No, I'll work on that, I'll work on that."

25. UM9187 elaborated, "It's a machine, and also, it's probably like a type of corporation. A type of corporation [U/I] registered with documentation so that everything is fine." **QUINONEZ-HERNANDEZ** responded, "Okay, okay. Yeah, I understand now." UM9187 advised, "So that you're aware. Alright? it arrives to a corporate office and... well, the company uses more [U/I]." **QUINONEZ-HERNANDEZ** asked, "Do you know how long it takes to arrive? Did your friend tell you how long it will take to arrive? To see." UM9187 answered, "No, well, what does it take? Two (2) or three (3) days**."** **QUINONEZ-HERNANDEZ** stated, "Okay, it's set. Well, let me get on it." UM9187 advised, "As long as it's, as long as it's a company." **QUINONEZ-HERNANDEZ** asked, "How, how? It's not an address... it's doesn't have to arrive to a residential address?" UM9187 answered, "To a company. It could arrive, but if it's at a company, it will be better." **QUINONEZ-HERNANDEZ** responded, "No, he didn't tell me that. He told me to find a house, a residential so that it arrives." UM9187 replied, "Yes, I mean, that's possible but so that, that, it looks better, some type of company." UM9187 continued, "But if there is no other way, it can be a house." **QUINONEZ-HERNANDEZ** asked, "But it's for right now, right? You need it right now?" UM9187 answered, "It's better. Yeah, yeah, if it's tomorrow, it's better. It's for now..." **QUINONEZ-HERNANDEZ** replied, "Alright then. I am going to start looking." UM9187 responded, "Yeah because that shit has been there for a while, dude. Get it on, dude, because... we need it." **QUINONEZ-HERNANDEZ** reiterated, "Oh. Alright, let me start looking. I am telling you to take care, don't drink too much, get well." UM9187 stated, "Give it

your best with that, dude. [U/I].” **QUINONEZ-HERNANDEZ** replied, “Yes, let me work on that. It's set.”

26. Based on my training, experience, and familiarity with the investigation, I believe that **QUINONEZ-HERNANDEZ** told UM9187 that **QUINONEZ-HERNANDEZ** was using his personal phone (“I'm sorry, I forgot I was using the personal”) when **QUINONEZ-HERNANDEZ** and UM9187 (based in Mexico) discussed logistics, related to a possible large narcotic laden shipment, concealed inside a “machine,” preferably sent to a “corporation,” that **QUINONEZ-HERNANDEZ** would receive on behalf of UM9187 and another unknown subject, referred to as “Prieto.” UM9187 directed **QUINONEZ-HERNANDEZ** to locate an address, preferably a corporation/business, as this type of location would look less suspicious. **QUINONEZ-HERNANDEZ** would receive the “machine” at a location that **QUINONEZ-HERNANDEZ** would attempt to locate, after which I believe that **QUINONEZ-HERNANDEZ** would then send the delivery to a secondary location (i.e., Australia). The parties also discussed future shipments and the need for **QUINONEZ-HERNANDEZ** to invest and/or to locate investors in their narcotics trafficking. Based on their training, experience and familiarity with the investigation, case agents believe in this intercepted conversation UM9187, and **QUINONEZ-HERNANDEZ** discussed a shipment of cocaine.

27. Between April 2, 2025, and May 3, 2025, there have been four telephonic contacts with UM9187, suggesting from prior intercepts and investigation to date that **QUINONEZ-HERNANDEZ** and UM9187 are actively planning shipments of narcotics from Mexico to the United States.

**<u>QUINONEZ-HERNANDEZ, using 818-478-0243, Discusses a Pending Drug Shipment from Mexico with MARTINEZ, using 818-614-0909</u>**

28. On March 29, 2025, at approximately 7:42 p.m., **818-478-0243**, used by **QUINONEZ-HERNANDZ**, received a call from **818-614-0909**, used by **Equiel MARTINEZ**. During the call, the parties greeted, and **MARTINEZ** said, "What was I going to tell you? Uh, um…call the man and make a three-way call and see what he has to say. Because…[VOICES OVERLAP] **QUINONEZ-HERNANDEZ** asked, "What man?" **MARTINEZ** continued, "The guy with the store, bro. To make an appointment to see him and everything." **QUINONEZ-HERNANDEZ** replied, "Fine." **MARTINEZ** said, "The thing is, from the start, we need to…I don't know if we need to give him another ID, another name, or some…I don't know how to do it." **QUINONEZ-HERNANDEZ** commented, "I was also going to tell you, Prieto called me today in the morning, dude." **MARTINEZ** responded, "Uh-huh." **QUINONEZ-HERNANDEZ** explained, "That we need another face, because he says that over there, they are going to send it differently. It's now going to be through a company, dude. And that shit is asking for all the information about who, uh…well, where it's going to arrive. And even…but the company is going to call, man, the company. And I said, 'Oh well, it's no problem. I will give you the face and everything. A [AUDIO BREAKS] house and that's it.' And he told me, 'That's fine. As long as they have the same address of where that is going to arrive.' And I said, 'Alright, that's fine.' [VOICES OVERLAP] **MARTINEZ** [U/I]." **QUINONEZ-HERNANDEZ** asked, "Huh?" **MARTINEZ** continued, "No, I was talking about they needed an ID card…the person. Uh-huh. [VOICES OVERLAP]." **QUINONEZ-HERNANDEZ** said, "Like that. And the guy told me…Prieto told me that…he said, 'Have that ready for me because…' He says that the problem was that dude, when they sent it- he guys there at the-at the border, they made holes through the

metal, dude." **MARTINEZ** stated, "Uh-huh." **QUINONEZ-HERNANDEZ** explained, "They put some damn…some damn things that they made holes all over, dude, to see if it had anything. But he said the good thing was that it didn't have anything. And they sent it back, dude. They sent it back and those guys fixed it and all. And he said that… [VOICES OVERLAP]." **MARTINEZ** said, "Good thing it didn't have anything." **QUINONEZ-HERNANDEZ** replied, "Nothing, dude, nothing at all. And he says that – that it's coming back again, but that it took them like three weeks, a month to fix it. [AUDIO INTERRUPTS] It was a pain, dude. And I told him, 'Well, yeah, it's fine.' And he said, 'But have that ready for me on Monday.' He said, 'Have it…' **MARTINEZ** acknowledged, "Yeah." **QUINONEZ-HERNANDEZ** continued, "…'face and everything.'" **MARTINEZ** asked, "And has Ramiro said anything?" **QUINONEZ-HERNANDEZ** replied, "Huh? No, dude. Well, he just texts me, man, that, 'What's up? What's up?' and this, but, well…" **MARTINEZ** stated, "Oh, so then, so then…[VOICES OVERLAP]."

29. **QUINONEZ-HERNANDEZ** exclaimed, "Oh! I didn't tell you, right?" **MARTINEZ** replied, "No, I don't know anything." **QUINONEZ-HERNANDEZ** asked, "Oh, no? Oh, I'll show you when I see you. The audio that they sent me." [VOICES OVERLAP] **MARTINEZ** stated, "Uh-huh." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** explained, "He was going to travel there. The guy was supposed to go there driving, and I told him, 'Look, man. It's up to you.' He said, 'Yes, man, they don't believe me over here, how is that possible? Again? And that…' I said, 'Well, I don't know what happened, man. It's the new administration.' But let me tell you…well, I called and everything, and said, 'No, man, that…that's done. It was done right there at UP-s…at that thing.' **MARTINEZ** asked, "Huh?" **QUINONEZ-HERNANDEZ** replied, "In that little truck. They told me." [VOICES OVERLAP] **MARTINEZ** stated, "Uh-huh." **QUINONEZ-HERNANDEZ** explained, "They said, 'That's over.' I said,

'What do you mean?' They said, 'Yes, that…it's no use.' Well, I recorded that same call and I sent it to him. And I told him, 'Look, man, I already investigated and look at that. This is what the operator from there is telling me. That thing is already…' He said, 'Son of a bitch, then it's real.' I said, 'Well, yeah, man. And you wanted me to go in there, man. No, of course not.' **MARTINEZ** said, "Yeah, well, you're…well, you looked good." [AUDIO INTERRUPTS] **QUINONEZ-HERNANDEZ** asked, "And he kept talking asking, 'What's up? Have you gotten any money from somewhere to make a payment over here, or something?' I said, 'No, man, from where? Right now, I'm going to [AUDIO INTERRUPTS] [U/I] and shit!'

30. **QUINONEZ-HERNANDEZ** later stated, "Once you have a business…let's go, let's go, I will pick you up. Where are you?" **MARTINEZ** replied, "No, [STAMMERS I…" [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** said, "[U/I] So we could have a chat. It's been a while since I've seen you and…if you want [U/I]." [VOICES OVERLAP] **MARTINEZ** responded, "No, it's because you…as soon as you arrive [U/I] you lock yourself in and nobody will take you out, dude. And…" [VOICES OVERLAP] **MARTINEZ** said, "I say, 'No, this dude later…' I'm going to running up and down, like, 'bring beers, we need ice…' And Luis just there…no." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** responded, [AUDIO INTERRUPTS] [U/I] "I already have the [U/I] for the beers. Don't tell me about it. But take it easy, I already got it. In fact…" [VOICES OVERLAP] **MARTINEZ** stated, "Yeah." **QUINONEZ-HERNANDEZ** continued, "In fact, do you want to invest in [U/I] right now? We could already open it." **MARTINEZ** replied, "No, what for, dude? No, first, it's the shop, dude." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** said, "Listen! I'll wait, [AUDIO INTERRUPTS] [U/I]. They stole a beer truck, dude." **MARTINEZ** exclaimed, "No fucking way!" **QUINONEZ-HERNANDEZ** replied, "Corona or Modelo. For real, man. And he said,

'It's just because I don't have anywhere else to put it.' But he said, 'If you want to invest, go ahead.' And I feel like buying around three thousand dollars, dude. To have some there." [VOICES OVERLAP] **MARTINEZ** commented, "Oh, that's good. Yeah, man. You could rent a storage and put it there." **QUINONEZ-HERNANDEZ** [AUDIO INTERRUPTS] [U/I] stated, "But, no, I'm might just buy a fucking car. I don't know. [U/I]" [VOICES OVERLAP] **MARTINEZ** responded, "I'm – I'm going to give you the number so you can call the guy, dude. Because you speak English. He – he is white, that guy is white." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** confirmed, "Send it to me. Yeah. Okay, but let's see. What am I going to tell him, dude? The lease, how much, what, how…[MUMBLES]." [VOICES OVERLAP] **MARTINEZ** said, "Uh-huh. No. I already know how much it costs. It costs two thousand, two hundred, but he has two locations. Tell him you want to see both locations. And when he could make an appointment to see the locations. He is going to ask you – he is going to ask you, what you are going to sell." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** acknowledged, "Uh-huh." **MARTINEZ** directed, "Tell him that clothes, that you bought a pallet, like…" [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** agreed, "Oh! I'm going to tell him that I get pallets of clothing, and stuff like that, from…merchandise from Costco and Amazon." [VOICES OVERLAP] **MARTINEZ** affirmed, "Uh-huh. And that…uh-huh, and you have cell phone cases, chargers, and all that stuff." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** confirmed [U/I], "Yeah, we need to make a façade, right? To the thing, right?" **MARTINEZ** replied, "Well, yeah, maybe. But I'm saying…uh-huh, just for…maybe just for the first few days so the guy can see it." **QUINONEZ-HERNANDEZ** acknowledged, "Uh-huh." **MARTINEZ** continued, "I already asked everything about that, and the lady told me, 'No, that guy doesn't even come. He doesn't even come.' [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** commented,

"No…yeah, they don't give a fuck. They just want to collect the rent, dude." **MARTINEZ** answered, "Yeah, she said, 'As long as you paid the rent, he doesn't show up.' Then, uh, make the appointment and ask him when we can see the stores." **QUINONEZ-HERNANDEZ** replied, "Okay, all set. Send it to me right now so I could just do it." [VOICES OVERLAP] **MARTINEZ** agreed, "I'll send you a text. Alright." **QUINONEZ-HERNANDEZ** replied, "Alright, then."

31. Based on my training, experience, and familiarity with the investigation, I believe **QUINONEZ-HERNANDEZ** explained to **MARTINEZ** that Prieto requested a new identity to receive the drug shipment concealed in the metal commodity. **QUINONEZ-HERNANDEZ** told **MARTINEZ** that Prieto further explained that the metal shipment will be sent using a different company so the identity and address of the person receiving the shipment must match the shipping company's records. **QUINONEZ-HERNANDEZ** further explained that Customs and Border Protection Officers drilled multiple holes in the metal. Based on my training and experience, I know that Mexico-based drug traffickers will often send a "test-run" of a vehicle, or commodity, to make it appear the future drug laden vehicle or commodity has a history of being inspected, or "crossing" into the United States from Mexico successfully. **QUINONEZ-HERNANDEZ** and **MARTINEZ** also discussed renting a space and making it appear as a legitimate business ["I'm going to tell him that I get pallets of clothing, and stuff like that, from…merchandise from Costco and Amazon"] to conceal it's use for illegal activity. **MARTINEZ** explained to **QUINONEZ-HERNANDEZ** that so long as rent is paid, no one will show up to see what activity is happening in the rented space ["They just want to collect the rent, dude."].

32. Between the dates of April 2, 2025, until May 20, 2025, there have been 148 telephonic contacts between **QUINONEZ-HERNANDEZ** and **MARTINEZ** on **747-724-5107** and **818-614-0909** suggesting that **QUINONEZ-HERNANDEZ** is actively planning on

furthering his narcotic activities in the United States and is engaging with other known DTO members in order to further DTO activities.

**QUINONEZ-HERNANDEZ and SANCHEZ-GONZALEZ Discuss Future Drug Ventures over 747-724-5107 and 414-213-5108**

33. On April 1, 2025, at approximately 6:16 p.m., **SANCHEZ-GONZALEZ**, using **414-213-5108**, called **747-724-5107**, used by **QUINONEZ-HERNANDEZ**. During the intercepted call, **QUINONEZ-HERNANDEZ** asked, "What's up?" **SANCHEZ-GONZALEZ** [U/I]. **QUINONEZ-HERNANDEZ** repeated, "What's up, Rey?" **SANCHEZ-GONZALEZ** answered, "No, it's just that he was calling – a guy was waiting on me to fix his car. [AUDIO GLITCH][U/I] at the parking spots waiting for me." **QUINONEZ-HERNANDEZ** replied, "Oh, okay, good, good." **SANCHEZ-GONZALEZ** stated, "Yeah." **QUINONEZ-HERNANDEZ** asked, "And you haven't seen Guero?" **SANCHEZ-GONZALEZ** replied, "Yeah, he's…" [VOICES OVERLAP]. **QUINONEZ-HERNANDEZ** confirmed, "He's around." **SANCHEZ-GONZALEZ** continued, "…around." **QUINONEZ-HERNANDEZ** replied, "Alright, alright, alright. No, well, I always had hopes to do something there with that dude, there with you all. That dude gets from us [STAMMERS] from…you already know how much that dude would get. I say for him to buy some cars, and we will get that good line. That way we can stop messing around." **SANCHEZ-GONZALEZ** stated, "Look, I'm going to talk with him on – the fifth – on the fifth, we have a party." **QUINONEZ-HERNANDEZ** replied, "Oh, well, let me know. Let me know." **SANCHEZ-GONZALEZ** said, "Uh-huh. That's why…" [VOICES OVERLAP]. **QUINONEZ-HERNANDEZ** directed, "Just don't mention anything because you know that dude panics about everything. Just tell him [STAMMERS] about that. That, that we want to work with him and if, well, we can do something there." **SANCHEZ-GONZALEZ** confirmed, "Yeah."

**QUINONEZ-HERNANDEZ** continued, "To arrive with a good handful and stop messing around." **SANCHEZ-GONZALEZ** replied, [AUDIO BREAKS] "We'll see what he says." **QUINONEZ-HERNANDEZ** acknowledged, "Yeah, my Rey." **SANCHEZ-GONZALEZ** said, "Alright then." **QUINONEZ-HERNANDEZ** replied, "We already…I'm here for anything, my Rey, you already know." **SANCHEZ-GONZALEZ** confirmed, "Alright." [VOICES OVERLAP] **QUINONEZ-HERNANDEZ** reiterated, "I'm still here, dude. Alright." [VOICES OVERLAP] **SANCHEZ-GONZALEZ** said, "Okay, take care."

34. Based upon my training, experience, and familiarity with the investigation, I believe **QUINONEZ-HERNANDEZ** solicited **SANCHEZ-GONZALEZ** to arrange a new drug venture with "Guero," and believed "Guero" would be able to purchase large quantities of cocaine. Based on my training and experience, I also know that "car or cars" is code for a kilogram of cocaine. **QUINONEZ-HERNANDEZ** said, "Alright, alright, alright. No, well, I always had hopes to do something there with that dude, there with you all. That dude gets from us [STAMMERS] from…you already know how much that dude would get. I say for him to buy some cars, and we will get that good line. That way we can stop messing around**."** **SANCHEZ-GONZALEZ** said, "Look, I'm going to talk with him on – the fifth – on the fifth, we have a party." Based upon this exchange, I believe **SANCHEZ-GONZALEZ** has familiarity with "Guero" and knows that "Guero" purchases larger quantities of cocaine ["you already know how much that dude would get," and "I always had hopes to do something with that dude."]. I further believe **SANCHEZ-GONZALEZ** intended to see and speak with "Guero" about the drug venture on April 5, 2025 ["I'm going to talk with him on the fifth, we have a party."].

35. Along these same lines, I further believe that **QUINONEZ-HERNANDEZ** directed **SANCHEZ-GONZALEZ** to limit the information he shares with "Guero" because

**QUINONEZ-HERNANDEZ** believes "Guero" panics. Based upon my training, experience and familiarity with the investigation, I believe **QUINONEZ-HERNANDEZ** did not want "Guero" to become overly nervous and back out of future drug ventures, potentially for five kilograms (i.e., a "good handful") of cocaine [**QUINONEZ-HERNANDEZ** directed, "Just don't mention anything because you know that dude panics about everything. Just tell him [STAMMERS] about that. That, that we want to work with him and if, well, we can do something there."]

**<u>QUINONEZ-HERNANDEZ and SANCHEZ-GONZALEZ Discuss Future Drug Ventures over 747-724-5107 and 414-213-5108</u>**

36. On May 15, 2025, at approximately 12:30 p.m., **747-724-5107**, used by **QUINONEZ-HERNANDEZ** called **SANCHEZ-GONZALEZ**, using **414-213-5108**. The parties greeted each other. **QUINONEZ-HERNANDEZ** stated, "Nothing came up over there, buddy?" **SANCHEZ-GONZALEZ** replied, "Nothing." **QUINONEZ-HERNANDEZ** asked, "No?" Mmm, I wanted… I wanted to arrive there on Tuesday." **SANCHEZ-GONZALEZ** asked, "When?" **QUINONEZ-HERNANDEZ** replied, "On Tuesday." **SANCHEZ-GONZALEZ** asked, "next week?" **QUINONEZ-HERNANDEZ** replied, "Yes. With some…" **SANCHEZ-GONZALEZ** stated, "Okay." **QUINONEZ-HERNANDEZ** asked, "If was…I wanted to take out four (4) Camry's from the auction, if there was a way." **SANCHEZ-GONZALEZ** acknowledged, "Okay." **QUINONEZ-HERNANDEZ** repeated, "Four (4)." **SANCHEZ-GONZALEZ** responded, "Give me a chance. Let me tell them [AUDIO GLITCH] this week." **QUINONEZ-HERNANDEZ** replied, "I'll leave it to you, buddy. To-to…they are bad ass. Bad ass, buddy. It's top notch." **SANCHEZ-GONZALEZ** acknowledged, "Okay." **QUINONEZ-HERNANDEZ** replied, "Let [AUDIO GLITCH] me know, okay?" **SANCHEZ-GONZALEZ** stated,

"Yes…maybe…I think it'll happen." **QUINONEZ-HERNANDEZ** confirmed, "All-all set. Thank you, thank you."

37. Based upon my training, experience, and familiarity with the investigation, I believe that **QUINONEZ-HERNANDEZ** referenced four kilograms of cocaine and interchangeably used "Camrys" as a code word for cocaine. I further believe that **QUINONEZ-HERNANDEZ** plans on traveling to Milwaukee, Wisconsin, in the near future to sell **SANCHEZ-GONZALEZ** four kilograms of cocaine.

**<u>PEREZ-SANTANA and MEDINA-RODRIGUEZ discuss sources of supply using 414-210-8099 and 414-530-4099</u>**

38. On April 28, 2025, at approximately 6:13 p.m., **414-530-4099**, used by Jesus **MEDINA-RODRIGUEZ**, called **PEREZ-SANTANA** at **414-210-8099**. **PEREZ-SANTANA** asked, "What happened with that dude?" **MEDINA-RODRIGUEZ** responded, "Uh, listen. He..." **PEREZ-SANTANA** asked, "Huh?" **MEDINA-RODRIGUEZ** stated, "He got busy. That his daughter... his daughter, um..." **PEREZ-SANTANA** asked, "So, then? What did you guys agree on? What did he tell you?" **MEDINA-RODRIGUEZ** stated, "Well, that—that... look. The truth... That—that... what's it called? That if I wanted to go... But that he had to be at the hospital, I don't know what the fuck." **PEREZ-SANTANA** asked, "Yeah. Okay, so then he is not coming tomorrow?" **MEDINA-RODRIGUEZ** stated, "Uh, no." **PEREZ-SANTANA** responded, "No? So then not right now?" **MEDINA-RODRIGUEZ** exclaimed, "Listen!" **PEREZ-SANTANA** responded, "Tell me." **MEDINA-RODRIGUEZ** replied, "[STAMMERS] And there another thing. I don't know.... I don't know. Look, [STAMMERS] it seems like we call them... [BLOWS NOSE] The guy from Califas (California) called me." **PEREZ-SANTANA** asked, "Uh-huh. And what did he tell you? What did he tell you?" **MEDINA-RODRIGUEZ** stated, "The one

from Califas?" **PEREZ-SANTANA** replied, "Yeah." **MEDINA-RODRIGUEZ** responded, "To say hi to you." **PEREZ-SANTANA** stated, "[CHUCKLES] For real, man." **MEDINA-RODRIGUEZ** answered, "No, [STAMMERS] that when could he come. And I told him, "No, not right now." And... and I said, "It's because your luggage went up a lot." He said, "Yes, but I thought that... that it was going up." Just a bunch of lies, right?" **PEREZ-SANTANA** replied, "Yeah. Well, just lies, man. Well, um... well, tell him to bring two (2), but at sixteen (16). Tell him."

39. **MEDINA-RODRIGUEZ** continued, "Yes, well, that's—that's what I was going to tell you. Yeah. I said, "Let me tell Carlitos. "I'm going to tell that to Carlitos." **PEREZ-SANTANA** responded, "But—but if he is going to come until next week, he can go to hell, man. Because, um—um... uh-huh. Uh, [STAMMERS] that one is urgent, dude. And if not, so I can look over here, because even if I pay a bit more, but there is a guy that goes to Chicago, dude." **MEDINA-RODRIGUEZ** responded, "Yeah." **PEREZ-SANTANA** commented, "But, well, if I don't—don't have any other way, dude?" **MEDINA-RODRIGUEZ** responded, "Yeah, yeah, yeah. If not, I will go and I'll get the one thousand (1,000) bucks."

40. **PEREZ-SANTANA** asked, "There you go, dude. Then why don't you do it?" **MEDINA-RODRIGUEZ** replied, " Well... let me—let me see. Let me ask the guy from Califas to—to see what he says." **PEREZ-SANTANA** acknowledged, "Well... well... alright then, dude. But—but call me today, dude. If not, so that tomorrow... because I have a lot of pressure, dude. Alright?" **MEDINA-RODRIGUEZ** asked, "You have high pressure? Dude, take the pill." **PEREZ-SANTANA** replied, "No, dude, it's that... I should've another number [plug] by now, dude, but it's fucked. Alright? Alright, set. Call me, dude." **MEDINA-RODRIGUEZ** confirmed, "Alright, then, dude."

41. Based on my training, experience and familiarity with the investigation, I believe **MEDINA-RODRIGUEZ** supplies **PEREZ-SANTANA** with narcotics and distributes narcotics in the greater area of Milwaukee. I further believe that **PEREZ-SANTANA** has depleted his narcotics supply and **MEDINA-RODRIGUEZ** is attempting to find additional sources to supply to **PEREZ-SANTANA**. **MEDINA-RODRIGUEZ** noted that he would reach out to "the guy from Califas" (California) to see if he could potentially sell narcotics to **PEREZ-SANTANA**. **PEREZ-SANTANA** stated that if the "guy from Califas" does not have a supply, **PEREZ-SANTANA** will reach out to his contact in Chicago, even if he has to pay extra.

**PEREZ-SANTANA and MEDINA discuss QUINONEZ-HERNANDEZ, using 414-210-8099 and 414-530-4099**

42. On May 15, 2025, at approximately 12:20 p.m., **414-210-8099**, used by **PEREZ-SANTANA** called **MEDINA-RODRIGUEZ**, using **414-530-4099.** The parties greeted each other. **MEDINA-RODRIGUEZ** stated, **"**That guy from Cali keeps calling me." **PEREZ-SANTANA** replied, "Me too, man." **MEDINA-RODRIGUEZ** commented, " Yeah, I [STAMMERS]already blocked him, man. He sent me videos and photos of all that shit. Fuck that shit. I already blocked... I deleted him." **PEREZ-SANTANA** asked, "And why does the idiot send you videos?" **MEDINA-RODRIGUEZ** stated, "It's bullshit." **PEREZ-SANTANA** replied, "No, no, I am telling you, asshole. Um, I am sure he came to see **Rey** [**Reynaldo SANCHEZ-GONZALEZ**, user of **414-213-5108**], right?" **MEDINA- RODRIGUEZ** stated, "Yes, but I think Rey told him to go fuck himself, or something." **PEREZ- SANTANA** responded, "No, um... no, no. What happened was [STAMMERS] that he [STAMMERS] doesn't want to come just for one (1) damn... for one (1) tire. He wants to bring the four (4) at once." **MEDINA-RODRIGUEZ** replied, "No, but [STAMMERS] the problem is, I think he's here. The

issue is I think the asshole is here." **PEREZ-SANTANA** asked, "Oh, that's why he keeps insisting, right?" **MEDINA-RODRIGUEZ** answered, "Yeah. And you already know... you know how it always..." **PEREZ-SANTANA** replied, "Uh, I haven't answered that guy. No, well, no..." **MEDINA-RODRIGUEZ** responded, "No, [STAMMERS] now, like... you know how you have always low-balled him... [CHUCKLES]. Get them for about fourteen (14)."

43. **PEREZ-SANTANA** stated, "Um... no, well..." **MEDINA-RODRIGUEZ** stated, "Um... no, well..." **PEREZ-SANTANA** replied, "Later... we'll talk later. I will go—go to your house, man. [STAMMERS] at... are you going to the gym today? Are you going to the gym today?" **MEDINA-RODRIGUEZ** answered, "Uh, no, man. Not today." **PEREZ-SANTANA** replied, "I will go by later and we can talk. We'll see. Alright? And—and, um... yes, yes... fuck it. Yeah? But you call him, man. Because..." **MEDINA-RODRIGUEZ** responded, "No, not me. I already blocked him." **PEREZ-SANTANA** asked "Alright? Yeah? Well, you can call him from my phone."

44. Based on my training, experience and familiarity with the investigation, I believe **MEDINA-RODRIGUEZ** is referred to **QUINONEZ-HERNANDEZ**, (i.e., **747-724-5107** and **818-478-0243**) when he stated, "guy from Cali." I further believe **QUINONEZ-HERNANDEZ** is contacting **MEDINA-RODRIGUEZ**, in addition to **SANCHEZ-GONZALEZ** (**414-213-5108**) to sell four kilos of cocaine, i.e. "He wants to bring the four (4) at once."

**<u>SANCHEZ-GONZALEZ uses 414-213-5108 for a Cocaine Sale</u>**

45. On April 9, 2025, at approximately 2:23 p.m., 414-213-5108, used by **SANCHEZ-GONZALEZ**, received a call from (414) 248-3526, used by UM3526. During the call, **SANCHEZ-GONZALEZ** stated, "Hey, I have one (1) [AUDIO BREAKS] and a half (1/2)." UM3526 replied, "Nah, I'm good right now." **SANCHEZ-GONZALEZ** asked, "You want it?"

UM3526 answered, “I’m good [AUDIO BREAKS] right now, friend.” **SANCHEZ-GONZALEZ** asked, “No?” UM3526 answered, “No, I got plenty, right now. Next week.” **SANCHEZ-GONZALEZ** replied, “Oh, okay. It's... okay. Okay, it's only one (1) and a half (1/2). No?” UM3526 replied, “I don't have any money, uh, here. I got it at the other place.”

46. **SANCHEZ-GONZALEZ** responded, “Oh, okay. [BRIEF PAUSE] Give me more... uh, one hundred (100) down.” UM3526 asked, “How much?” **SANCHEZ-GONZALEZ** repeated, “Uh, one hundred (100).” UM3526 clarified asking, “One hundred (100)?” **SANCHEZ-GONZALEZ** repeated, “Yeah, one hundred (100) down. It's twelve (12), give me eleven (11).” UM3526 agreed stating, “Alright.” **SANCHEZ-GONZALEZ** confirmed, “You want it?” UM3526 stated Uh…” **SANCHEZ-GONZALEZ** continued, “For—for... yeah, it's—it's only for this, for you.” UM3526 replied, “[SIGHS] One (1) and half (1/2) ounces.” **SANCHEZ-GONZALEZ** stated “It’s…” [VOICES OVERLAP] UM3526 agreed to the terms stating, “Yep.” **SANCHEZ-GONZALEZ** continued, “It's eight hundred (800) for one (1) and four (4)...” UM3526 confirmed, “Alright.” **SANCHEZ-GONZALEZ** continued, “Four hundred (400) for the other one. It's twelve (12), give me eleven (11). You want it.” UM3526 agreed, “Alright. Uh, I gotta go to the other place. What time?” **SANCHEZ-GONZALEZ** answered, “Whenever you want. It's because I need the money. I haven't... uh, my [MUMBLES] my kid is in the doctor.” UM3526 stated, “Alright, uh... alright, I can do that. Yeah, I'll do that. When?”

47. **SANCHEZ-GONZALEZ** again confirmed asking, “You want it?” UM3526 answered, “Yeah, okay. What time?” **SANCHEZ-GONZALEZ** replied, “Okay, uh, maybe... twenty (20) minutes.” UM3526 advised, “Uh, I gotta go to the other place. Uh, give me a half (1/2) hour.” **SANCHEZ-GONZALEZ** confirmed, “In a half (1/2)?” UM3526 asked, “Well, what time is it right now? Two (2:00), two (2:00), what?” **SANCHEZ-GONZALEZ** asked, “Two (2)

hours?" UM3526 replied, "No, no, no, no, no. What time is it? The time." **SANCHEZ-GONZALEZ** replied, "What time? Uh, I—I go in... twenty (20) minutes." UM3526 stated, "Three (3:00) o'clock. Three (3:00) o'clock." **SANCHEZ-GONZALEZ** replied, "Okay. I'll see you at three (3:00) o'clock." UM3526 confirmed, "Okay, I'll be there."

48. **SANCHEZ-GONZALEZ** advised UM3526, "Listen, man. Um... so I need the money, man, right now." UM3526 replied, "Yeah, okay. I'll go get it right now." **SANCHEZ-GONZALEZ** confirmed, "Okay. I'll go." UM3526 stated, "Be here at three (3:00) o'clock, okay?" **SANCHEZ-GONZALEZ** replied, "Yes, okay. That's fine."

49. Based on my training, experience, and familiarity with the investigation, I believe **SANCHEZ-GONZALEZ** offered to sell UM3526 a 1 (one) and a half (1/2) ounce quantity of cocaine for $1,100. I am aware that cocaine is often sold in ounce quantities, and that $800 is within the current price range, in the greater Milwaukee area, for an ounce of cocaine. **SANCHEZ-GONZALEZ** advised UM3526 that **SANCHEZ-GONZALEZ** would sell UM3526 cocaine for the discounted price of $1,100, to which UM3526 agreed.

**SANCHEZ-GONZALEZ and OSORIO-JARMILLO discuss narcotics source-of-supply**

50. On May 6, 2025, at approximately 9:42 p.m., OSORIO-JARMILLO, using **414-334-4157**, placed an intercepted call to **SANCHEZ-GONZALEZ**, using **414-213-5108**. During the call, the parties greeted, and **OSORIO-JARMILLO** asked, "Okay. What did Abuelito tell you?" **SANCHEZ-GONZALEZ** answered, "Mmm, nothing now. The dude hasn't called me." **OSORIO-JARMILLO** stated, "Oh, because he had told me that... there was someone around who was offering him for cheaper." SANCHEZ-GONZALEZ asked, "Really?" OSORIO-JARMILLO confirmed, "Uh-huh."

51. OSORIO-JARMILLO continued, “He told me... that supposedly he wants me to go... [BRIEF PAUSE] speak with him.” SANCHEZ-GONZALEZ asked, “No, well... but how much cheaper?” **OSORIO-JARMILLO** advised, “I don't know. I need.... I think he told me to go speak with him. That's what he told me.” **SANCHEZ-GONZALEZ** replied, “Oh.” **OSORIO-JARMILLO** stated, “Because figure... every time that he... that he gets some from you...he notifies me.”

52. **SANCHEZ-GONZALEZ** replied, “Alright. Well…” **OSORIO-JARMILLO** continued, “That's why... I don't—don't know, right? But... he was telling me about that.” **SANCHEZ-GONZALEZ** advised, “Mm-hmm. Well, check on that and let me know. It's no problem, in any case.” **OSORIO-JARMILLO** replied, “Yes. l will check into that. Yes, because he told me that... for me to go speak with him. To come to an agreement. He told me to go speak with him. That's what he told me.” **SANCHEZ-GONZALEZ** advised, “Oh, okay. Well, go and let me know.”

53. Based on your affiant’s training, experience, and knowledge of the investigation, **OSORIO-JARMILLO** informed **SANCHEZ-GONZALEZ** that their drug customer, referred to as “Abuelito,” obtained a new source-of-supply, offering the cocaine at a cheaper price. **SANCHEZ-GONZALEZ** admitted that **SANCHEZ-GONZALEZ** had not communicated lately with the customer, and **OSORIO-JARMILLO** advised that the drug customer offered to introduce **OSARIO-JARMILLO** to the source-of-supply.

## <u>CONCLUSION</u>

54. The location data associated with the **TARGET CELL PHONES** will continue to assist case agents in conducting targeted and further identify the locations and individuals determining the location and activities of the participants of the DTO and produce evidence of

violations of Title 21, United States Code, Sections 846 and 841, conspiracy to distribute controlled substances, and distribution of controlled substances. Although wire and/or electronic interceptions over the **TARGET CELL PHONES** have expired and renewed interceptions over the **TARGET CELL PHONES** are not anticipated, case agents, using location data over the **TARGET CELL PHONES**, will better be able to locate **all targets involved** in support of future arrest operations and prosecution in the Eastern District of Wisconsin.

55. Case agents searched law enforcement databases to confirm that the **TARGET CELL PHONES** are currently being serviced by T-Mobile and AT&T.

56. Case agents are requesting this warrant authorizing the collection of data related to the **TARGET CELL PHONES** for 30 days to further investigate activities, and to continue to identify locations all targets are traveling to further their drug distribution trafficking activities.

57. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

58. Based on my training and experience, I know that some service providers can collect timing advance or engineering data commonly referred to as per call measurement data (PCMD), RTT, True Call, Advance Timing, WebMap, or equivalent. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.

59. Based on my training and experience, I know that T-Mobile, T-Mobile / Metro PCS, and AT&T can collect E-911 Phase II data about the location of including by initiating a signal to determine the location of the Target Cell Phones on, T-Mobile, T-Mobile and AT&T's network or with such other reference points as may be reasonably available.

60. Based on my training and experience, I know that T-Mobile and AT&T's network can collect cell-site data about Target Cell Phones.

**Cell-Site Data**

61. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **TARGET CELL PHONES**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## E-911 Phase II / GPS Location Data

62. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **TARGET CELL PHONES**, including by initiating a signal to determine the location of the **TARGET CELL PHONES** on the Service Provider's network or with such other reference points as may be reasonably available.

63. Based on my training and experience, I know that T-Mobile can also use its precision location tool, known as WebMap.

## Subscriber Information

64. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number)

provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELL PHONES'** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

65. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

66. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

67. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONES** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

68. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until

**180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of (747) 724-5107 and (818) 478-0243 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

69. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephones assigned call numbers (collectively referred to as the Target Cell Phones") as follows:

    a. **747-724-5107**, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    b. **818-478-0243,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    c. **414-210-8099,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    d. **414-213-5108,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    e. **414-334-4157**, whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

    f. **818-614-0909,** whose service provider is T-Mobile, a wireless telephone provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

2. Information about the location of the Target Cell Phones that are within the possession, custody, or control of T-Mobile.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

All information about the location of the Target Cell Phones described in Attachment A for a period of thirty days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, and T-Mobile, are required to disclose the Location Information to the government. In addition, AT&T and T-Mobile, must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T and T-Mobile services, including by initiating a signal to determine the location of the Target Cell Phones on AT&T and T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T and T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).